# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 21, 2010

## STATE OF TENNESSEE v. LEONARD EUGENE MYERS

**Appeal from the Hamilton County Criminal Court**
**No. 264872    Don W. Poole, Judge**

**No. E2010-00762-CCA-R3-CD - Filed June 3, 2011**

The Defendant, Leonard Eugene Myers, was convicted following a jury trial in the Hamilton County Criminal Court of reckless aggravated assault, a Class D felony; vehicular assault, a Class D felony; and driving under the influence (DUI), a Class A misdemeanor. See T.C.A. §§ 39-13-102(2)(A) (2006) (amended 2009, 2010), 39-13-106(a) (2010), 55-10-401 (2008) (amended 2010). The trial court merged the reckless aggravated assault and DUI convictions with the vehicular assault conviction and sentenced the Defendant to four years as a Range I offender. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in admitting blood analysis evidence because the chain of custody was not properly established; (3) the trial court erred in excluding evidence of the victim's civil judgment against the Defendant; and (4) the trial court erred in sentencing the Defendant based upon enhancement factors that were not found beyond a reasonable doubt by the jury. We affirm the convictions, but we vacate the judgments and remand the case to the trial court for entry of one judgment reflecting that the reckless aggravated assault and DUI convictions are merged with the vehicular assault conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Vacated; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Ardena J. Garth, District Public Defender, and Richard Kenneth Mabee, Assistant District Public Defender, for the appellant, Leonard Eugene Myers.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; R. Steve Bebb, District Attorney General Pro Tempore; and Brooklyn Martin and Paul Moyle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arose when the car the Defendant was driving struck Eric Shrader's motorcycle and Mr. Shrader was seriously injured. At the trial, Mr. Shrader testified that on February 7, 2007, he left work in downtown Chattanooga on his motorcycle. He said he wore a helmet and a padded jacket. He said his next memory was of "leaning" on pavement and someone telling him not to move and that an ambulance was coming. He said his next memory was from three or four weeks later, after he awoke from a medically induced coma. He said he received the following injuries from the collision: a fractured C-2 vertebra, a broken sternum, a punctured lung that was secondary to broken ribs, chipped vertebrae throughout his back, an open pelvic fracture, loss of twenty-nine units of blood, broken femurs, a "snapped" ankle, and a broken thumb. He identified photographs of himself in the hospital and of his injuries. He said that he was placed on a respirator and a feeding tube and that he was hospitalized for four weeks, was in an inpatient rehabilitation program for two weeks, and was in outpatient rehabilitation for three to four months. He said that he was confined to a wheelchair for several months, that he later used a walker and a cane, and that he had to learn to walk again. He said he lost over $20,000 in wages due to his injuries. He stated that he took pain medication for a period of time but that after "several years," he was no longer in pain. His medical records were received as an exhibit.

On cross-examination, Mr. Shrader acknowledged that he declined to speak with defense counsel before the trial. He also acknowledged that his medical bills totaled over three million dollars. He said that he did not see the driver of the car that hit him and that he was knocked unconscious in the wreck.

Arthur "J.R." Potter, Jr., testified that he drove on Bonny Oaks Drive with his son on February 7, 2007. He said a motorcycle passed him on the right side of the road and traveled in front of him. He said that after they topped a hill and returned to level ground, a car came into his lane of traffic and hit the motorcycle. He said the motorcycle's driver was thrown into the air a distance that "looked like it was high as a telephone pole," although the distance might not have been that high.

J.R. Potter testified that he got out of his truck but did not see the victim. He said that his son found the victim under the front of his truck and that had he been traveling two or three miles an hour faster, he would have run over the victim. He said his son tried to keep the victim on the ground while he checked on the driver of the car that struck the motorcycle.

Brian Potter testified that on February 7, 2007, he was a passenger in his father's truck. He said they were traveling in the northbound lane when the victim passed them on the right side at a red light. He said that one to two hundred yards after they topped a hill, the Defendant came into their lane of travel and struck the victim, throwing the victim into the truck.

Brian Potter testified that he checked on the victim first and then the Defendant. He said that the Defendant appeared to be intoxicated and that the Defendant asked if he could get his girlfriend because the car was hers and he did not have a driver's license or insurance. He identified the Defendant as the person he saw that night.

On cross-examination, Brian Potter admitted that he did not smell alcohol when he checked on the Defendant. He said he was not sure whether the Defendant was "drunk" but noted that the Defendant had slurred speech and would not look him in the eye. He denied he ever said that the odor of alcohol was so strong that he could become intoxicated from the smell. He said the windshield of the car the Defendant drove was broken.

Chattanooga Police Detective Justin Kilgore testified that he had been on duty on the night of February 7, 2007, and was on his way home when he heard a radio call about a motorcycle wreck involving injuries. He said he went to the scene and found a crowd of people standing around a person lying on the ground who was wearing a helmet. He said that either an ambulance or the fire department had just arrived and were attending to the victim. He said that after another patrol officer arrived, he surveyed the scene and saw a car facing south with a person standing beside it. He said he thought the car was blue. He admitted he never saw the Defendant in the car.

Chattanooga Police Officer David Allen testified that he was working on February 7, 2007, and received a dispatch call to respond to the scene of a traffic accident involving injuries. He said that when he arrived, he saw a red Chevrolet Blazer in the northbound lane and a blue Chevrolet Corsica on the sidewalk. He identified photographs of these vehicles. He identified a photograph of the motorcycle taken at an impound lot and noted that the front end was destroyed and had blue paint on one of the tires. He said the motorcycle appeared in the photograph as it did at the scene. He identified a diagram of the scene prepared using a top controller station. He said a top controller station used a laser to measure points at the scene to diagram the scene accurately.

Officer Allen testified that the Defendant had a large bump on his forehead that appeared to be from the wreck and that the Defendant was standing near his car with another officer when he arrived at the scene. He said that the Defendant admitted he was the driver and that this statement was filmed by equipment on the officer's patrol car. He said,

-3-

however, that the recording had not been preserved by the police department due to computer storage limitations when no one requested preservation. He said that due to the bump on the Defendant's head and the possibility of a concussion, he did not request that the Defendant perform field sobriety tests. He said that he did not see anyone other than the Defendant and a police officer near the blue car and that no other person at the scene claimed to have been the driver. He said another officer transported the Defendant to the "blood room" at the police station while he investigated the paint on the vehicles involved in the wreck and gathered information from the vehicles. He said he went to the "blood room" and watched a nurse draw blood from the Defendant and seal the vials in a blood kit. He said he filled out the paperwork in the blood kit, took custody of the kit, and walked next door to the property intake area with it. He identified a copy of the form he completed and said it reflected that the blood was drawn on February 7, 2007, at 10:10 p.m. He said another officer took the Defendant to the hospital after the blood was drawn.

Officer Allen testified that the blood kit required the signatures of the requesting officer and the nurse who collected the blood. He described the kit as having two vials used for collecting blood and on which a suspect's name was written, bubble wrap with a tape closure, a Ziploc bag for the vials sealed in bubble wrap, and a box that was sealed after the Ziploc bag was placed inside. He said that in this case, before he accepted the sealed kit, he witnessed the blood going into the vials and the kit's being sealed.

On cross-examination, Officer Allen testified that he arrived at the scene of the collision at 9:08 p.m. and that he thought the wreck took place at 9:00 p.m. He said that the people were already out of the vehicles "[w]ith the exception of [the victim, who] was on the ground." He said the Defendant stated he drank one beer.

Officer Allen testified that the nurse typically wrote a defendant's name on the vials but admitted he did not specifically recall watching her do so in this case. He said he "may have turned around." He claimed he was "pretty sure" he wrote his name and the name and address of the police department on the box. He said he did not recall when it became standard procedure to write a defendant's complaint number on the blood kit box but acknowledged it was possible that someone wrote the Defendant's number on the Defendant's kit.

Officer Allen testified that the video recordings from the patrol cars were used to preserve evidence. He said the server had been expanded recently to accommodate more recordings as cameras were added to additional cars. He did not recall how long after the crime he obtained the indictment but agreed it was probably within six months. He said he might have failed to request the video when the case went to the grand jury.

-4-

Officer Allen testified that there was damage across the entire windshield of the blue Corsica. Viewing a photograph of the Corsica, he said he believed there was a hole on the driver's side of the windshield. He said he did not recall any cuts on the Defendant's head but agreed he was concerned about the bump on the Defendant's head. On redirect examination, Officer Allen identified the Defendant.

Smith Cutter, a property technician with the Chattanooga Police Department, testified that he did not recall receiving blood sample kit 7-0513 in a drop box on February 7, 2007. He said he researched the item and found that he received the kit from Officer Allen. He said that he would have inspected the kit to ensure it had the proper information regarding the officer's name and address and that the two seals on the box were in place. He said he did not accept kits without the proper information on the box. He said the seals on kit 7-0513 were in place. He said he put the kit on the top shelf of Refrigerator 1 or 2 and entered information about the case into a database used for blood kits that are to be sent to the Tennessee Bureau of Investigation (TBI). He said his supervisor took the kits to the TBI laboratory in Nashville every two weeks.

Chattanooga Police Sergeant Craig Johnson testified that he was the supervisor of the property and evidence room. He said that he was not the only person who transported samples to laboratories but that he did most of it. He said he took a blood kit and toxicology request to the TBI in late February 2007. He said the kit was submitted to the property room on February 7 and stored in a refrigerator in the property room until February 22. He said that they received a request on February 22 from the case officer, that the kit was "signed out," and that he took it to the TBI laboratory in Nashville and left it in a locked and secured drop box. He said that he inspected the box before taking it to the laboratory and that it was sealed properly. He said that if someone tampered with a box or if a box were not properly sealed, he would not submit it to the TBI laboratory and that he would contact the case officer and probably the internal affairs department, as well. He said he followed standard procedure with respect to this kit.

Mary Ann Carlson testified that she was a forensic technician in the toxicology unit of the TBI laboratory in Nashville. She said her job duties included receiving blood kits and handling the preliminary toxicology results. She said the laboratory received a kit from the Chattanooga Police Department on February 22, 2007. She said she was the person who took it from the drop box, although she admitted she did not specifically recall doing so. She said the drop box was accessible only from inside the department. She said there were only three people with keys to the drop box: herself, the evidence receiving supervisor, and the director of the laboratory. She said her notes reflected that the box was properly sealed, that she verified the contents, and that she entered information into the database. She said she put bar-coded labels on the two tubes with the numeric identifier. Her written request identified

the laboratory number as 071003127 and the requesting agency case number as 07122262. She said that her usual procedure was to transfer the tubes to a scientist for alcohol testing but that in this case, "I actually had to transfer the tubes to my manager because I think there was a lapse of my attendants and scientist attendants. So somebody had to transfer them from me to her." She said this was the last contact she had with the evidence.

On cross-examination, Ms. Carlson explained the "lapse." She said that at the time she completed the intake duties, the scientist to whom she was going to transfer the evidence was not in the laboratory, and she transferred the evidence to her supervisor. She said that her manager transferred the evidence to the scientist once the scientist was present and that during the interim, the evidence was locked in a refrigerator.

On redirect examination, Ms. Carlson agreed that it was common practice for evidence to be locked in a refrigerator if the scientist was not present to receive it. She said her supervisor was the only person in her unit able to access her locked, personal refrigerator.

Special Agent Jennifer Hall, a forensic scientist in the TBI laboratory's toxicology unit, testified as an expert witness in toxicology. She said she received the blood samples in this case from Special Agent Kelly Hopkins. She said alcohol testing was performed before she received the evidence for drug testing.

Agent Hall testified that her first procedure upon receiving a sample was to document any deficiencies in quantity or less than ideal condition. She said there were no notations of any deficiencies in the sample in this case. She said that her next step was to run presumptive tests for five classes of drugs and then perform a "basic drug screen" for approximately eighty-three drugs. She said the next step was to test for certain drugs such as cocaine or THC that needed an additional analysis. She said she took these steps in analyzing the blood sample in the present case. She identified the toxicology report she prepared. The exhibit listed the laboratory case number as 071003127 and the requesting agency case number as 0712262.

Agent Hall testified that the blood sample tested positive for diazepam, dihydrocodeine, nordiazepam, methadone, cocaine, alprazolam, and THC, a metabolite of marijuana. She identified diazepam and nordiazepam as ingredients of the drug Valium, a muscle relaxant and anti-anxiety medication that acted as a central nervous system depressant and caused impaired coordination, drowsiness, dizziness, confusion, and "loss of your reflexes." She noted that the quantity of Valium in the blood sample was 0.10 micrograms per milliliter and that the therapeutic range for Valium was 0.02 to 0.04. She stated that the sample was "positive" for diazepam but did not quantify the result. Specifically as to the nordiazepam, she said that the quantity in the blood sample was 0.10 micrograms per

milliliter and that the therapeutic range was 0.02 to 1.8. She said dihydrocodeinone was also known as hydrocodone or Lortab and was a pain medication. She did not quantify the amount of the substance in the blood sample. She said that methadone was used for severe pain and in drug treatment centers and that its effects were similar to those of Valium. She said that the therapeutic level for methadone was 0.07 to 0.1 micrograms per milliliter and that the blood sample contained less than 0.05 micrograms per milliliter. She said the blood sample contained 0.07 micrograms per milliliter of cocaine. She said that cocaine had a therapeutic range but did not quantify it. She noted that cocaine was classified as a stimulant, but she said it caused either "a rush or a crash." She said that alprazolam was also known as Xanax and that its use could cause drowsiness, dizziness, confusion, and blurred vision. She said the blood sample contained 0.11 micrograms per milliliter of alprazolam, which was more than the therapeutic range for the drug of 0.03 to 0.10. She stated that she determined that marijuana had been used sometime before the blood sample was drawn because THC, an inactive metabolite of the drug, was present. She said the THC level was 37.2 centigrams per milliliter. She said cocaine continued to break down in the blood after a sample was drawn and noted that she tested the blood on March 10, 2007, after the sample was drawn on February 7, 2007.

Agent Hall testified that the combined effect of drugs varied by individual. She said there were recommendations against combining some of the drugs she found in the blood sample. She said that the drugs in question could cause impairment individually but that she could not say how the effect would be multiplied from combining the drugs.

On cross-examination, Agent Hall testified that other laboratory tests were done on the blood sample before she received it. She acknowledged that a person could build up a tolerance to some drugs, including methadone, and would require prescriptions of higher quantities to obtain the desired effect. She admitted it was possible for a person to have higher quantities of a drug in his system but not show the desired effects. She said her scientific equipment limited her to stating only that Valium and Lortab were present in the blood sample. She said that different drugs were metabolized by the body at different rates and acknowledged that the nordiazepam in the blood sample was indicated as an active metabolite that would still have effects but that the same could not be said of marijuana as evidenced by the presence of THC. Agent Hall conceded that her testimony about therapeutic levels of drugs were those that had been published and that the Defendant's therapeutic levels could be different.

The Defendant did not present any proof. The jury found the Defendant guilty of reckless aggravated assault, vehicular assault, and DUI. The State submitted certified copies of the Defendant's two prior DUI convictions as proof that this was the Defendant's third

DUI conviction. The State also submitted a certified copy of the Defendant's driving history. The jury found the Defendant guilty of DUI, third offense.

At the sentencing hearing, the trial court received the presentence report as an exhibit. It reflected that the forty-five-year-old Defendant did not make a statement to the presentence officer. In addition to the two previous DUI convictions that were the basis of the conviction in the present case, the Defendant had prior convictions for violation of the driver's license law; three counts of driving on a suspended, cancelled, or revoked license; two counts of possession of a controlled substance; possession of glue for an unlawful purpose; and reckless driving. He had additional convictions for two counts of driving on a suspended, cancelled, or revoked license and one count of public intoxication that occurred after the crimes in the present case.

The Defendant told the presentence report preparer that he dropped out of eighth grade, that he did not read or write well, and that his physical health was poor, including injuries from a knife assault, a serious car accident in which four vertebrae were shattered, and a previous diagnosis of Hepatitis C for which he was not presently receiving treatment. The Defendant was admitted to a psychiatric hospital in 2009 after exhibiting bizarre behaviors and hearing voices while he was confined to the workhouse. He admitted having a long history of substance abuse. He said he began using marijuana at age sixteen and smoked an average of two "joints" per day. He said he began using pills at age sixteen or seventeen and used them "off and on" since then. He began drinking beer at age fifteen and stated his daily average intake was one quart. The Defendant admitted that he was enrolled in inpatient rehabilitation programs on three prior occasions and that he had attended Alcoholics Anonymous and Narcotics Anonymous meetings a few times. He said that he had worked as a roofer but that he had not worked for nine years because he was unable to concentrate. His disability claims over several years were denied. Although he was the father of three children, all were adopted by others because he and their mother were unable to care for them.

The victim testified that he had been married for fourteen months when the crime occurred. He said his wife took one-and-one-half months' leave from her employment in order to stay with him at the hospital. He said that due to his physical disabilities that required him to use a wheelchair and a walker, his wife and his mother drove him to medical appointments. He said learning to walk again was painful. He said that friends rebuilt his bathroom because it was not handicapped accessible and he could not take a shower in its previous configuration. He said that he still had pain in his ankle upon getting out of bed and that climate changes caused him hip pain. He said he had pain where his femurs were broken and in his neck where his vertebrae were fused and a steel plate was placed. He said he had frequent headaches that had not occurred until after the wreck. He said any athletic

endeavors involving his legs were still painful. He said that he had been a recent college graduate and that a week and a half before the crime, he began a new engineering career. He said he was unable to work for four months and received no disability or other benefits through his employer. He said he was able to return to work in mid to late June 2008. He said that he and his wife lost over $20,000 of income due to his injuries and that their credit had been good but that they were harassed by collections agents due to his medical expenses. He said that the collection matters were eventually resolved and that there were no longer any outstanding medical bills. He expressed his desire that the Defendant receive a maximum sentence.

On cross-examination, the victim testified that his medical bills were in excess of one millon dollars and were paid by his private insurance. He admitted he did not have an exact dollar amount. He said that his $20,000 lost wages claim was an estimate, that his weekly pay at the time was $1000, and that the balance reflected his wife's lost income. He said his wife was a salaried employee and had to work reduced hours for a lower salary for about nine months.

On redirect examination, the victim acknowledged the letter he submitted that was part of the presentence report. On questioning by the court, the victim stated that his own lost wages ranged from over $12,000 to $15,000. On redirect examination, the victim stated that his employment was terminated after nine weeks because he had no disability benefits but that he was rehired in June 2008.

The Defendant submitted a sentencing memorandum as an exhibit. It stated the following: The Defendant had a short attention span that caused him academic difficulties. He could not read or write well and quit school in the eighth grade. He began drinking at age fifteen and liked alcohol because it slowed his racing thoughts. He used various drugs beginning at age sixteen and preferred Xanax and marijuana because they helped him focus. He began working as a roofer despite his struggles with addiction. The Defendant was badly injured in an assault in 1987, and he was in a wreck in 2000 in which he was ejected from his car and received long-term injuries. His back was damaged, and he had to learn to walk again after this wreck, although he was never able to return to work. He had no insurance. In 2004, he received steroid treatments and pain medications for his back injury, but he was unable to continue treatment after about a year because he lost his insurance. The Defendant claimed he used drugs that were not prescribed to him to treat his continued back pain. The Defendant's last substance abuse treatment was in 1997. The Defendant was hospitalized in 2006, and he was noted to have anxiety, panic attacks, bipolar disorder, and Hepatitis C. His only psychiatric hospitalization was in 2009, when he presented with delirium from substance abuse withdrawal, antisocial personality, and borderline intellect. He was given medication and continued treatment after his release. The Defendant wanted to continue

mental health treatment and had not realized he could receive treatment without insurance. The Defendant's family would assist him after his release.

After receiving the proof, the trial court found that the Defendant had a prior history of criminal convictions or behavior, that the victim's personal injuries were particularly great, and that the Defendant had no hesitation about committing a crime when the risk to human life was high. See T.C.A. § 40-35-114(1), (6), (10) (2006) (amended 2007, 2008). The court rejected the Defendant's proffered mitigating factors that he was remorseful for pain caused to others; that he had a long-standing, untreated substance abuse problem; that he had debilitating back pain but was uninsured; that he could not read and did not write well but would like to obtain his GED; that he suffered untreated mental illness for a long time for which he did not know he could receive treatment even though he was uninsured; and that he had the support of a loving family. See id., § 40-35-113(13) (2010).

The court found that the Defendant's prospects for rehabilitation were poor, that society needed to be protected from the Defendant's future conduct, that measures other than confinement had frequently or recently been applied to the Defendant without success, and that a sentence of probation would depreciate the seriousness of the offense. See id., § 40-35-103(1) (2010). The court imposed a Range I sentence of four years to be served in the Department of Correction for reckless aggravated assault, four years for vehicular assault, and eleven months and twenty-nine days to be served at 100 percent for DUI, third offense. The court revoked the Defendant's driver's license for five years. It also merged the reckless aggravated assault and DUI convictions with the vehicular assault conviction. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions. He argues that there is not sufficient proof that he was intoxicated, that his intoxication caused the wreck, or that he recklessly caused bodily injury to another. The State responds that the proof supports the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Regarding the vehicular assault conviction, the offense required the State to establish that the Defendant was intoxicated, that the Defendant recklessly caused serious bodily injury to another person by operating a motor vehicle, and that the intoxication was the proximate cause of the injury. See T.C.A. §§ 39-13-101(a)(1) (2010) (assault), 39-13-106(a) (vehicular assault), 55-10-401 (intoxication, DUI).

> "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Id., § 39-11-106(31) (2006).

In the light most favorable to the State, the evidence reflects that the Defendant exhibited signs of intoxication at the scene, that he admitting drinking one beer, and that his blood contained diazepam, dihydrocodeine, nordiazepam, methadone, cocaine, alprazolam, and THC. There was proof that these drugs could impair a person's ability to drive and that the combination of some of them could cause greater effects. The proof is undisputed that the victim suffered serious bodily injury . The Defendant's recklessness was established by the proof he drove into oncoming traffic and hit the victim's motorcycle. The proof shows that the Defendant's actions and condition were the proximate cause of the victim's serious bodily injury. The evidence is sufficient to support the vehicular assault conviction.

Turning to the reckless aggravated assault conviction, the State was required to show that the Defendant recklessly committed an assault and that it caused serious bodily injury to another. See id., § 39-13-102(2)(A) (reckless aggravated assault). As noted above, the record establishes that the Defendant engaged in reckless conduct by driving on the wrong side of the road, that he struck the victim's motorcycle head-on, and that the victim suffered serious bodily injury.

Finally, we consider the Defendant's conviction for DUI, third offense. The State was required to show that the Defendant drove on a roadway frequented by the public at large

while under the influence of an intoxicant, including drugs, that impaired his ability to operate his car safely. See id., § 55-10-401. In order for the Defendant to receive enhanced punishment, the State was also required to establish that the offense was the Defendant's third DUI offense. See id., § 55-10-403(a)(1)(A)(v) (Supp. 2006) (amended 2007, 2008, 2009, 2010). The proof in the light most favorable to the State established that the Defendant drove on a public road under the influence of drugs and that his ability to drive safely was impaired by the drugs. Certified copies of the Defendant's two prior DUI convictions were received as evidence. The evidence is sufficient to support the conviction.

In so holding, we have considered the Defendant's argument that no field sobriety tests were given and that Brian Potter did not smell the odor of alcohol at the scene. The Defendant's argument overlooks the proof that intoxication can result from drug use, as well as that of alcohol, and that he had multiple intoxicating drugs in his blood.

As part of our consideration of the sufficiency of the evidence, we have considered and rejected the Defendant's argument that the evidence is insufficient because the blood sample evidence was not properly admitted. We note that a review of the sufficiency of the evidence necessarily includes all the evidence. The use of improperly admitted evidence would only result in a reversal of the conviction, not an acquittal. State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981). For the reasons noted above, the evidence, viewed in the light most favorable to the State, was sufficient to support the convictions. The question of whether the trial court properly admitted the blood sample evidence is addressed in section II below. The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred in admitting the evidence about the blood sample because the State did not establish an unbroken chain of custody for the sample. He relies on the fact that the State did not present the testimony of the TBI agent who accepted the blood sample from Ms. Carlson, tested it, and transferred it to Agent Hall for additional testing. The State argues that the trial court did not abuse its discretion in admitting the evidence. We agree with the State.

The Tennessee Rules of Evidence provide, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). If the facts and circumstances regarding the evidence "reasonably establish the identity and integrity of the evidence," it should be admitted. State v. Cannon, 254 S.W.3d 287 (Tenn. 2008). If the State's proof of the chain of custody is lacking, then the evidence should not be admitted unless other appropriate

means demonstrate the identity and integrity of the evidence. Id. In establishing the chain of custody, the State is not required to call as a witness every person who handled the evidence, or establish the identity of the evidence beyond all possibility of doubt, or to exclude every possibility of tampering. Id. On appeal, a trial court's ruling regarding the adequacy of the chain of custody is reviewed for abuse of discretion. Id. at 295.

Before ruling that the State had adequately shown the chain of custody and allowing the proof, the trial court heard the testimony of Agent Hall outside the presence of the jury regarding the laboratory's standard operating procedures. Agent Hall testified that after a blood sample was received, a laboratory technician checked it in, after which a forensic scientist checked it out for testing. She said a sample always went to the "alcohol room" first unless there was a sufficient quantity of blood for both alcohol and drug screens to be performed and a drug screen was requested. She said each person had his or her own locked refrigerator in a vault for securing evidence. She said that when two tubes of blood were submitted, policy required that the tubes stay together. She admitted she had no personal knowledge of what happened after the blood sample was transferred from Ms. Carlson to the scientist who tested it for alcohol, but she said she was familiar with the standard operating procedure and had no reason to believe it was not followed in the present case. She said that after the alcohol analysis was completed, the case was transferred to her. She said she retrieved the vials of blood and the case folder from Agent Hopkins, the person who did the testing. She said, "We did the chain of custody. That is done through our BLIMS system." She said she verified the identifying information on the vials as being the same as that stated on the toxicology request form and noted that she verified the information by initialing the form. She said the identifying information she verified included the name of the subject, the agency case number, and the laboratory case number. She said that the numbers on the vials matched to the Defendant's name.

The trial proof established that Officer Allen witnessed a nurse draw the victim's blood into vials and seal them into an evidence kit. Officer Allen took the evidence to the property room, where Mr. Cutter received it and placed it in a secure refrigerator. It remained in the refrigerator until Sgt. Johnson took it to the TBI laboratory and left it in a secure drop box. Ms. Carlson retrieved it from the lock box, prepared the necessary paperwork, entered information into a database, transferred custody of the sample to her supervisor, and placed the sample into a secure refrigerator. Ms. Carlson's supervisor later removed the sample from the secure refrigerator and transferred its custody to an agent for alcohol testing. Agent Hall received the sample from the agent who did the alcohol testing and performed drug testing on it. The laboratory identification number and the requesting agency identification number for the sample were the same on the intake paperwork prepared by Ms. Carlson and the toxicology report prepared by Agent Hall. Both Ms. Carlson and

Agent Hall testified about the standard procedures used at the laboratory to maintain the security of blood samples and stated that the procedures were followed in this case.

Upon review, we hold that the Defendant has not demonstrated that the State did not adequately establish the chain of custody for the blood sample. Agent Hall testified in a jury-out hearing about the standard procedures and security measures followed in the laboratory. Ms. Carlson testified that she placed identifying information on the blood vials, that she completed identifying paperwork, that she transferred the evidence to her supervisor and placed it in a locked refrigerator, and that her supervisor removed the evidence and transferred it to a forensic scientist for alcohol testing. Agent Hall testified that she received the vials from the scientist who did the alcohol testing, that she verified the identifying information, and that the information matched the case numbers assigned to the Defendant. There was no proof to suggest that the evidence had been tampered with or handled incorrectly.

The State was not required to call every witness who handled the evidence within the laboratory in order to establish a proper chain of custody. See Cannon, 254 S.W.3d 287. The trial court did not abuse its discretion in finding that the State sufficiently established a proper chain of custody. The blood sample evidence was properly admitted. The Defendant is not entitled to relief.

### III

In his next issue, the Defendant contends that the trial court erred in sustaining the State's objection to cross-examination of the victim as to whether the victim obtained a civil judgment against the Defendant. He argues that this evidence was relevant to show the victim's bias against him. The State counters that the trial court did not abuse its discretion. We agree with the State.

On cross-examination of the victim, Defense counsel asked whether the victim had a civil judgment against the Defendant. The State objected without identifying a basis for the objection, and the trial court sustained the objection. Later in the trial, the defense made an offer of proof of the civil judgment, which the trial court accepted. The court stated, however, that evidence of the judgment was not relevant to the trial.

The Defendant cites Tennessee Rule of Evidence 616, which permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness," and Rules 401 and 402 defining relevant evidence and establishing that relevant evidence is admissible but evidence that is not relevant is not admissible. We note that a criminal defendant should be afforded wide

latitude to cross-examine a victim about civil litigation arising from the crime. See, e.g., State v. Horne, 652 S.W.2d 916, 919 (Tenn. Crim. App. 1993); State v. Taurys K. Walls, No. 02C01-9601-CR-00019, Shelby County (Tenn. Crim. App. Oct. 14, 1998). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In the present case, the evidence of the civil judgment was relevant impeachment evidence that the victim might have harbored prejudice toward the Defendant due to the wreck and its aftermath. The trial court erred in ruling the evidence was not relevant. "However, in the final analysis improper admission or rejection of evidence is not grounds for reversal unless it shall affirmatively appear that the alleged error affected the result of the trial." Horne, 652 S.W.2d at 918 (citing McBee v. State, 372 S.W.2d 173 (Tenn. 1963)); see T.R.A.P. 36(b). The record reflects that other proof suggested the victim's prejudice against the Defendant. The victim testified at length during his direct examination about his numerous injuries, his extended hospitalization, the pain he suffered, his disabilities and rehabilitation, and his lost wages. The victim acknowledged on cross-examination that he refused to speak with defense counsel before the trial. Having considered all of the proof, we conclude that the exclusion of the impeachment evidence did not affect the result of the trial. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred by sentencing him based upon enhancement factors not found by the jury beyond a reasonable doubt. The State argues that the Defendant was properly sentenced under the 2005 amendments to the Sentencing Reform Act. We agree with the State.

We begin by noting the Tennessee Supreme Court's decision in State v. Gomez, 239 S.W.3d 733 (Tenn. 2007), and the rulings of the United States Supreme Court in Cunningham v. California, 549 U.S. 270 (2007); Blakely v. Washington, 542 U.S. 296 (2004); and Apprendi v. New Jersey, 530 U.S. 466 (2000). These cases addressed the infirmity of sentences in which a defendant's sentence was judicially enhanced by facts other than prior convictions that were not found by a jury to exist beyond a reasonable doubt. We note that the Defendant was sentenced, however, under the law as it existed after the 2005 amendments to the Sentencing Act, which removed presumptive sentences and which complies with the requirements of the Sixth Amendment. See State v. Banks, 271 S.W.3d 90, 144-45 (Tenn. 2008).

The Defendant acknowledges the present law, but he argues that the 2005 amendments and the case law upholding the 2005 Act remain contrary to Blakely. As an intermediate appellate court, this court is bound by the authority of our supreme court or the United States Supreme Court. See, e.g., Barger v. Brock, 535 S.W.2d 337, 340 (Tenn. 1976); Rudd v. State, 497 S.W.2d 746, 747 (Tenn. Crim. App. 1973). The Defendant is not entitled to relief.

We notice, however, as a matter of plain error that the trial court entered separate judgments for each of the three convictions, even though it merged the reckless aggravated assault and DUI convictions with the vehicular assault conviction. We vacate the judgments and remand the case to the trial court for entry of a vehicular assault judgment reflecting that the reckless aggravated assault and DUI, third offense convictions are merged with the vehicular assault conviction.

In consideration of the foregoing and the record as a whole, we affirm the convictions, but we vacate the judgments and remand the case to the trial court for entry of a single judgment consistent with this opinion.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE